UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| STEPHEN W. ROBERTSON, COMMISSIONER OF THE INDIANA DEPARTMENT OF INSURANCE AND ADMINISTRATOR OF THE PATIENT'S COMPENSATION FUND, <br><br>Plaintiff,<br><br>v.<br><br>THE MEDICAL ASSURANCE COMPANY, INC. n/k/a PROASSURANCE INDEMNITY COMPANY, INC.,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Case No. 2:13-CV-107 JD<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## **OPINION AND ORDER**

This is an insurance dispute between Indiana's Patient's Compensation Fund, through its administrator, Stephen W. Robertson, (the "Fund"), and the Medical Assurance Company, Inc., ("Medical Assurance"), which previously insured a physician whose medical malpractice spawned over 350 malpractice claims. Those malpractice claims have been litigated extensively in the Indiana state courts for nearly ten years, and the interested parties have litigated for nearly as long in federal court over who is responsible for the resulting damages. In this most recent chapter in the dispute, the Fund has filed a two-count complaint against Medical Assurance. The first count asserts that Medical Assurance breached its duty of good faith to its insureds in handling and defending the medical malpractice claims. The Fund argues that it is equitably subrogated to the insureds' common law bad faith claim against Medical Assurance because it paid those settlements on his behalf. The second count arises out of Medical Assurance's alleged failure to pay its share of judgments entered in favor of certain of the malpractice claimants

against Weinberger. Pursuant to the Indiana Medical Malpractice Act, the Fund paid those amounts to the claimants, and is therefore subrogated to the claimants' rights to collect against Medical Assurance. Ind. Code § 34-18-15-4.

Though it had answered the initial complaint, which only raised the bad faith claim, Medical Assurance has now moved to dismiss both the bad faith and statutory subrogation counts of the Fund's First Amended Complaint. [DE 26]. That motion has been fully briefed, accompanied by extensive supplemental submissions. [DE 27–34, 39, 40]. In an April 3, 2014 order, the Court directed the parties to file briefs stating their position as to whether the Court should certify certain questions to the Indiana Supreme Court, given the lack of applicable Indiana authority on those issues, [DE 35], and the parties have filed those submissions as well. [DE 36, 37]. For the reasons that follow, Medical Assurance's motion to dismiss is denied as to Count II. The Court takes the motion under advisement as to Count I, and certifies a question to the Indiana Supreme Court.

## I. FACTUAL BACKGROUND

Mark S. Weinberger, M.D., was an otolaryngologist—an ear, nose, and throat doctor—who practiced in Merrillville, Indiana until September 2004. [DE 25 ¶ 5]. He was the principal owner of Mark Weinberger, M.D., P.C.; the Merrillville Center for Advanced Surgery, LLC; and the Nose and Sinus Center, LLC. [*Id.*]. Weinberger and each of those entities were insured by Medical Assurance, now known as ProAssurance Indemnity Company, Inc. [*Id.* ¶ 19]. The policies carried coverage in the amounts required to establish financial responsibility under the Indiana Medical Malpractice Act, which were $100,000 per occurrence and $300,000 in the annual aggregate until July 1, 1999, after which they were $250,000 per occurrence and $750,000 in the annual aggregate. [*Id.*]. Medical Assurance in turn submitted certificates of insurance and applicable surcharges to the Fund in order to bring the insureds within the

2

protections of the Indiana Medical Malpractice Act, Ind. [*Id.* ¶ 20]. Those protections include a cap on liability to the health care providers of $250,000 per occurrence, with the Fund paying amounts in excess of that cap, up to its own statutory limit. [*Id.* ¶¶ 2, 20 n.1].

Unfortunately for all parties involved, Weinberger's practice was rife with malpractice, resulting in over 350 malpractice claims being filed against him. [*Id.* ¶ 21]. Weinberger ultimately fled to Europe in September 2004, and his whereabouts remained unknown for over five years until he was apprehended and returned to the United States to face prosecution. [*Id.* ¶¶ 25, 27]. Medical Assurance undertook Weinberger's defense in the malpractice actions, pursuant to its policies. [*Id.* ¶ 23]. The Fund alleges, however, that although potential coverage issues should have been clear to Medical Assurance from the very beginning, and certainly upon Weinberger's departure, Medical Assurance failed to set up a screen between personnel managing the claims defense and personnel managing the coverage issues. [*Id.* ¶ 29]. Instead, those personnel shared attorney–client information and work product through at least February 2011. [*Id.*]. When Weinberger returned to the United States in February 2010, Medical Assurance purported to erect a screen between claims and coverage personnel, but it assigned one of the individuals who had worked on the defense side for five years to the coverage side, where he had no restrictions on his access to claims information, and he continued to communicate with claims personnel about work product and attorney–client information associated with the defense of the claims through at least February 2011. [*Id.* ¶ 31].

The Fund further alleges that Medical Assurance failed to reserve its rights under the policies within a reasonable time, did not send reservation of rights letters in some cases until July 2010, and did not send them at all in some cases. [*Id.* ¶ 40]. It also failed to advise the insureds of coverage issues, failed to advise them of a conflict of interest among the insureds

who were represented by common counsel, failed to warn the insureds that their failure to cooperate in their defense could lead to a loss of coverage, and waited almost four years to file its declaratory judgment action relative to its coverage. [*Id.*]. The Fund also alleges various bad faith conduct relative to the defense of the claims itself, including that Medical Assurance took Weinberger's deposition while criminal charges were still pending against him, knowing that he would plead the Fifth Amendment, that it failed to adequately investigate the claims and attempt to settle them, that it failed to seek copies of relevant records or access to former employees of Weinberger, and that it never informed or failed to timely inform the insureds that policy limits were demanded in some of the malpractice claims. [*Id.*].

At least six of the malpractice claims proceeded to trial by jury, and all resulted in judgments against Weinberger and his entities. [*Id.* ¶ 35]. Two of those judgments exceeded Medical Assurance's policy limits, as one was for $390,000, and the other was for $1,250,000 plus $9,000,000 in punitive damages. [*Id.*]. Weinberger and the Fund then proceeded to settle their respective liability to all of the claimants, some individually and some in large groups. [*Id.* ¶¶ 42–53]. Medical Assurance only joined in one of the group settlements, however, and declined to pay its alleged share of the remaining judgments and settlements. [*Id.* ¶¶ 37, 38, 48, 52, 53]. Thus, pursuant to its obligation under the Medical Malpractice Act, the Fund paid all of the amounts allegedly owed by Medical Assurance, which forms the basis for its statutory subrogation claim in Count II. [*Id.* ¶¶ 38, 49].

The Fund filed its Complaint in this matter on March 22, 2013, and subsequently filed its First Amended Complaint on September 25, 2013. [DE 1, 25]. As previously indicated, the First Amended Complaint contains two counts. Count I asserts that Medical Assurance violated its duty of good faith to its insureds in a variety of ways, leading to an increase in the amount by

4

which the judgments and settlements exceeded its coverage limits. Though Medical Assurance owed this duty of good faith to its insureds, the Fund claims the right to assert this action under the doctrine of equitable subrogation, since it has paid all of those amounts to the claimants on the insureds' behalf. Count II is limited to the amounts that the Fund contends Medical Assurance owed to the claimants under its policies but failed to pay. Because the Fund paid those amounts upon Medical Assurance's failure to do so, it is statutorily subrogated to the claimants' rights against Medical Assurance.

## II. STANDARD OF REVIEW

Rule 12(b)(6) authorizes dismissal of a complaint when it fails to set forth a claim upon which relief can be granted. Generally speaking, when considering a Rule 12(b)(6) motion to dismiss, courts must inquire whether the complaint satisfies the "notice-pleading" standard. *Indep. Trust Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 934 (7th Cir. 2012). The notice-pleading standard requires that a complaint provide a "short and plain statement of the claim showing that the pleader is entitled to relief," which is sufficient to provide "fair notice" of the claim and its basis. *Id*. (citing Fed. R. Civ. P. 8(a)(2)); *Maddox v. Love*, 655 F.3d 709, 718 (7th Cir. 2011) (citations omitted); *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting Fed. R. Civ. P. 8(a)(2)). In determining the sufficiency of a claim, the court construes the complaint in the light most favorable to the nonmoving party, accepts all well-pleaded facts as true, and draws all inferences in the nonmoving party's favor. *Reynolds v. CB Sports Bar, Inc.*, 623 F.3d 1143, 1146 (7th Cir. 2010) (citation omitted).

The Supreme Court has adopted a two-pronged approach when considering a Rule 12(b)(6) motion to dismiss. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009) (citing *Twombly*). First, pleadings consisting of no more than mere conclusions are not entitled to the assumption of truth. *Id*. This includes legal conclusions couched as factual allegations, as well as "[t]hreadbare

5

recitals of the elements of a cause of action, supported by mere conclusory statements." *See Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Second, if there are well-pleaded factual allegations, courts should "assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id*. at 679.

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *McCauley v. City of Chi*., 671 F.3d 611, 615 (7th Cir. 2011) (citing *Iqbal* and *Twombly*). The complaint "must actually suggest that the plaintiff has a right to relief, by providing allegations that raise a right to relief above the speculative level." *Maddox*, 655 F.3d at 718 (citations omitted). However, a plaintiff's claim need only be plausible, not probable. *Indep. Trust Corp.*, 665 F.3d at 935 (quoting *Twombly*, 550 U.S. at 556). "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Id*. In order to satisfy the plausibility standard, a plaintiff's complaint must "supply enough fact to raise a reasonable expectation that discovery will yield evidence supporting the plaintiff's allegations." *Id*. Determining whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense," *see Iqbal*, 556 U.S. at 679 (citation omitted), and the Court will assess the Plaintiff's claims accordingly.

### III. DISCUSSION

Medical Assurance has moved to dismiss both counts of the Fund's First Amended Complaint. The Court finds that Indiana law is uncertain as to a dispositive question underlying Count I, and respectfully certifies that question to the Indiana Supreme Court. Medical Assurance's motion is therefore taken under advisement as to Count I, and is denied as to Count II.

A.   **Breach of the Duty of Good Faith**

Count I alleges that Medical Assurance breached its duty to its insureds, including Weinberger and his entities, in its handling of the medical malpractice claims, and that the Fund has been equitably subrogated to the insureds' interest in those claims. As noted in this Court's prior order, Medical Assurance has raised four separate grounds for dismissal: (1) that Indiana law does not allow equitable subrogation of an insured's bad faith claim against its insurer; (2) that even if it did, the Fund, as a statutory entity, does not have the authority to bring such a claim; (3) that the claim is time-barred; and, (4) that the complaint does not adequately plead bad faith by Medical Assurance. Indiana law governs the resolution of these issues, so this Court must attempt to resolve them as would the Indiana Supreme Court. *Stephan v. Rocky Mountain Chocolate Factory, Inc.*, 129 F.3d 414, 416–17 (7th Cir. 1997).

The Court addressed the first two grounds in its prior order, and found that Indiana law was uncertain on these questions. [DE 35]. As to the first issue—whether an insured's claim against its insurer for bad faith can be assigned through the doctrine of equitable subrogation—no Indiana appellate court has addressed this question.[1] *See Querrey & Harrow, Ltd. v. Transcontinental Ins. Co.*, 861 N.E.2d 719, 724 n.3 (Ind. App. Ct. 2007) (noting that this issue "has not been decided by an Indiana appellate court") *aff'd* 885 N.E.2d 1235 (Ind. 2008). Nevertheless, without citing a single case from any court holding that bad faith claims cannot be assigned through equitable subrogation, Medical Assurance insists that Indiana law is settled in its favor on this point. In so arguing, Medical Assurance relies heavily on *State Farm Mut. Auto. Ins. Co. v. Estep*, 873 N.E.2d 1021 (Ind. 2007), which this Court addressed in its previous order.

---

[1] Federal courts have confronted this question on two occasions, and predicted in both instances that Indiana law would recognize the equitable subrogation of such actions. *Certain Underwriters of Lloyd's v. Gen. Accident Ins. Co. of Am.*, 909 F.2d 228 (7th Cir. 1990); *PHICO Ins. Co. v. Aetna Cas. & Sur. Co. of Am.*, 93 F. Supp. 2d 982 (S.D. Ind. 2000) (Tinder, J.).

In *Estep*, the Indiana Supreme Court held that a judgment creditor could not force an insured judgment debtor to involuntarily assign any bad faith action it may have against its insurer. However, while this holding could theoretically be *extended* to the present circumstance, it is not directly on point and does not control the outcome of this issue. Further, based on a number of distinguishing features between *Estep* and the present case, it is not at all clear that the Indiana Supreme Court would extend *Estep's* logic to the issue at hand.

In particular, an insured's relationship with a third-party judgment creditor, as in *Estep*, is fundamentally different than its relationship with its excess insurer. The judgment-creditor/judgment-debtor relationship is inherently involuntary on the part of the judgment-debtor, and the decision to assign the claim from the debtor to the creditor to satisfy a judgment was involuntary in *Estep* as well. 873 N.E.2d at 1027. Where the third party is an excess insurer, however, the insured's relationship with the third party is the product of a voluntary arms-length agreement. The decision to enter that relationship in the first place is voluntary, and an insured could contractually prohibit or limit its excess insurer's right to the equitable subrogation of its bad faith claims if it so desires, which an insured could not do with a third-party judgment creditor.[2] In addition, an excess insurer has an incentive to maintain its relationship with its insured, so it is less likely to press a nuisance suit against a primary insurer against the insured's will than would be a judgment creditor, whose only incentive is to maximize its recovery from (or through) the insured.[3] Given these distinguishing features, the Court cannot conclude that *Estep* dictates the outcome of this issue.

---

[2] The Court recognizes that the Fund's relationship with the insureds is not entirely equivalent to that of an excess insurer, but while the terms and cost of its excess coverage may not be negotiable, participation in the Fund is still voluntary.

[3] It is also voluntary for an insured to submit a claim to and accept payment from its excess insurer, which is the triggering event for an equitable subrogation claim. However, foregoing

8

In addition, Medical Assurance cites several appellate cases that it says stand for the proposition that "[t]here is no 'subrogated' bad faith action under Indiana law; bad faith actions are personal to the insured." [DE 27 p. 7 (citing *Menefee v. Schurr*, 751 N.E.2d 757 (Ind. Ct. App. 2001), *Dimitroff v. State Farm Mut. Auto. Ins. Co.*, 647 N.E.2d 339 (Ind. Ct. App. 1995), and *Winchell v. Aetna Life & Cas. Ins. Co.*, 394 N.E.2d 1114 (Ind. Ct. App. 1979))]. That conclusion simply does not follow from those cases, however, as they merely hold that an insurer's duty of good faith runs only to its insured, not to third parties to the insurance agreement. The Fund's claim here is based on a breach of Medical Assurance's duty to its insureds, which those cases expressly recognize, not on any duty Medical Assurance may owe to the Fund, so those cases are inapplicable. Medical Assurance also cites these cases in support of its assertion that "Indiana has long rejected 'bad faith' claims asserted by any party other than an insured, *absent an assignment*." [DE 27 (emphasis added)]. However, equitable subrogation *is* a form of assignment,[4] and the question here is whether that form of assignment is cognizable for a bad faith action against an insurer. Therefore, despite Medical Assurance's arguments to the contrary, the Court concludes that there is no clear controlling Indiana precedent on this issue.

There is a similar lack of controlling authority as to the second question, which is whether the Fund has the authority to assert this cause of action, assuming it is available in the first place. Medical Assurance notes that the Fund is a statutory creation that has "no common law or inherent powers, but only such authority as is conferred upon them by statutory enactment." *Vehslage v. Rose Acre Farms, Inc.*, 474 N.E.2d 1029, 1033 (Ind. Ct. App. 1985). Because the Medical Malpractice Act does not expressly provide for the subrogation of insureds'

---

contracted-for excess insurance coverage could be quite a steep price to pay for retaining control over a bad faith claim.

[4] As Medical Assurance quotes in its own brief, "Subrogation is, in essence, an equitable assignment." [DE 32 p.5 (quoting *Bennett v. Slater*, 289 N.E.2d 144, 148 (Ind. Ct. App. 1972))].

bad faith claims against their primary insurers, as it does for claimants' rights against an insurer that fails to pay a judgment or settlement, Ind. Code § 34-18-15-4, Medical Assurance argues that the Fund does not have the authority to assert this common law cause of action. Conversely, the Fund notes that "[i]t is well settled that agencies have implicit power and authority as is necessary to fulfill the broad grant of authority given that agency by the legislature." *Martin v. Carraway*, 712 N.E.2d 1055, 1059 (Ind. Ct. App. 1999). Because the Fund has the statutory authority to provide excess insurance to health care providers, the Fund argues it has the implied right to bring the same action as could a private excess insurer.

Besides these general principles of administrative agency law, however, neither party has provided, nor has the Court located, any Indiana authority addressing an analogous situation. While many Indiana cases address the scope of agencies' authority to regulate or adjudicate, none address their authority to assert civil causes of action arising out of their *de facto* participation in the marketplace. Therefore, the Court again concludes that there is no clear controlling Indiana precedent on this question.[5]

The Court believes that these issues are appropriate for certification to the Indiana Supreme Court. Rule 64 of the Indiana Rules of Appellate Procedure provides:

> The United States Supreme Court, any federal circuit court of appeals, or any federal district court may certify a question of Indiana law to the Supreme Court when it appears to the federal court that a proceeding presents an issue of state law that is determinative of the case and on which there is no clear controlling Indiana precedent.

Ind. R. App. P. 64(a). Although certification should be approached "with circumspection," it may be appropriate where "'the case concerns a matter of vital public concern, where the issue

---

[5] Medical Assurance's argument that this action is barred because the Medical Malpractice Act does not create any causes of action is off point. The action here exists, if at all, under Indiana common law, and the Fund does not cite the Medical Malpractice Act as the source of its cause of action.

will likely recur in other cases, where resolution of the question to be certified is outcome determinative of the case, and where the state supreme court has yet to have an opportunity to [decide] . . . the issue.'" *Rain v. Rolls-Royce Corp.*, 626 F.3d 372, 378 (7th Cir. 2010) (alterations in original) (quoting *State Farm Mut. Auto. Ins. Co. v. Pate*, 275 F.3d 666, 672 (7th Cir. 2001)).

The questions here are a matter of vital public concern, as they are important to the functioning of the Fund and of the Medical Malpractice Act, and may also have a wider impact relative to excess insurers in general. The equitable subrogation issue is also likely to recur in other cases, as it has previously arisen in several federal cases, and the Indiana Court of Appeals and a Justice of the Indiana Supreme Court have each noted the lack of Indiana authority on the issue. *Querrey & Harrow, Ltd. v. Transcontinental Ins. Co.*, 885 N.E.2d 1235, 1238 (Ind. 2008) (Sullivan, J., dissenting); *Querrey & Harrow*, 861 N.E.2d at 724 n.3 (Ind. App. Ct. 2007). Resolution of these questions could thus be "of interest to the state supreme court in its development of state law." *Craig v. FedEx Ground Package Sys., Inc.*, 686 F.3d 423, 430 (7th Cir. 2012). In addition, the questions here are outcome determinative as to Count I, as an answer in Medical Assurance's favor would require dismissal of that count with prejudice. The Court acknowledges that the questions are not dispositive of the case as a whole, as the Fund has also asserted a statutory subrogation claim in Count II. However, that is an independent claim and does not provide an alternative basis for obtaining the relief the Fund seeks in Count I, so the Court thus does not interpret the joinder of these claims as a bar to certification.[6] Finally, as

---

[6] Of course, the Indiana Supreme Court "has full discretion to dictate which questions from the federal courts it will answer," so it is free to decline to accept this certification if it interprets its rule differently, or for any reason at all. *Brown v. Argosy Gaming Co., L.P.*, 384 F.3d 413, 416 n.2 (7th Cir. 2004)

11

discussed at length, the Indiana Supreme Court has yet to address these issues, and there is no clear controlling Indiana precedent.

For these reasons, the Court believes that certification is proper and would "further the interests of cooperative federalism." *Craig*, 686 F.3d at 431. To formulate the question, the Court notes, as did the Fund, that although the parties have addressed the issues separately, both issues essentially pertain to one central question—whether the Fund can pursue a claim for an insurer's breach of its duty of good faith to its insured. Therefore, the Court respectfully certifies the following consolidated question to the Indiana Supreme Court:

> Does Indiana law allow the Patient's Compensation Fund to pursue a claim against an insurer for the insurer's breach of its duty of good faith to its insured, through the doctrine of equitable subrogation?

Should the Indiana Supreme Court accept the certification of this question, it of course has the discretion to reformulate the question as it sees fit, and nothing in this opinion is meant to limit the scope of the inquiry undertaken by the Indiana Supreme Court. *Craig*, 686 F.3d at 432.

The latter two arguments Medical Assurance raises in support of dismissal are more easily disposed of. Medical Assurance argues that this claim is barred by the statute of limitations, which is an affirmative defense. Fed. R. Civ. P. 8(c)(1). While complaints "need not anticipate defenses and attempt to defeat them," *Richards v. Mitcheff*, 696 F.3d 635, 637 (7th Cir. 2012), "dismissal is appropriate when the plaintiff pleads himself out of court by alleging facts sufficient to establish the complaint's tardiness," *Cancer Found., Inc. v. Cerberus Capital Mgmt., LP*, 559 F.3d 671, 674–75 (7th Cir. 2009).

The statute of limitations applicable to this claim is two years, and that period begins to run when a plaintiff learns that "an injury had been sustained as a result of the tortious act of another." *Wehling v. Citizens Nat'l Bank*, 586 N.E.2d 840, 843 (Ind. 1992); Ind. Code § 34-11-2-4(a)(2). "For an action to accrue, it is not necessary that the full extent of the damage be known

12

or even ascertainable, but only that some ascertainable damage has occurred." *Cooper Indus., LLC v. City of S. Bend*, 899 N.E.2d 1274, 1280 (Ind. 2009). In this context, that occurs when an insurer's bad faith results in the entry of an excess judgment against its insured. *Reed v. Aetna Cas. & Sur. Co.*, No. 92-cv-328, 1995 U.S. Dist. LEXIS 9154, at *15–16 (N.D. Ind. Mar. 29, 1995) ("When the jury returned a verdict in excess of the policy limits, Churchwell either knew or should have known that she had been damaged by Aetna's failure to settle her claim. . . . Therefore, Churchwell's claim against Aetna accrued on April 26, 1989 when the jury returned a verdict in excess of policy limits.").

Here, the First Amended Complaint alleges that the various settlement agreements upon which the Fund's damages are based took place in 2012, well within the 2-year statute of limitations, given that the complaint was filed on March 22, 2013. The complaint does not expressly allege the dates of the judgments against the insureds, though the judgments attached as exhibits to the complaint indicate they were entered beginning in December 2011, also well within the statute of limitations. Medical Assurance argues for the first time in its reply brief that the first judgment was actually entered in August 2010. [DE 29 p. 14]. However, besides being waived for not being raised earlier, this argument is not proper in this context, as it depends on facts outside of the pleadings. The Court therefore concludes that the statute of limitations does not justify dismissal of this count.

Medical Assurance finally argues that the complaint should be dismissed because it does not adequately plead bad faith. "Indiana law has long recognized that there is a legal duty implied in all insurance contracts that the insurer deal in good faith with its insured." *Erie Ins. Co. v. Hickman by Smith*, 622 N.E.2d 515, 518 (Ind. 1993). Indiana also recognizes "a cause of action for the tortious breach of an insurer's duty to deal with its insured in good faith." *Id.* at

13

519. The duty of good faith includes, without limitation, "the obligation to refrain from (1) making an unfounded refusal to pay policy proceeds; (2) causing an unfounded delay in making payment; (3) deceiving the insured; and (4) exercising any unfair advantage to pressure an insured into a settlement of his claim." *Id.* In order to properly plead a claim for bad faith, a plaintiff must plead the existence of a duty of good faith, conduct that violates that duty, and resulting damages. *See id.*

The Fund has sufficiently pled such an action here. The complaint expressly alleges the existence of the duty of good faith, and attaches the insurance policies to demonstrate the insurer–insured relationship that gives rise to that duty. [DE 25 ¶ 54, exs. A–E]. The complaint also alleges multiple ways in which Medical Assurance violated its duty, including by failing to reserve its rights in within a reasonable time; to advise the insureds of coverage issues; to timely file its coverage case; to notify its insureds of a conflict of interest; to implement an ethical screen between the claims/defense and coverage personnel; to adequately investigate and/or attempt to settle the claims; to warn the insureds that their failure to cooperate could result in a loss of coverage; to timely inform the insureds of policy-limit settlement demands; to maintain the confidentiality of privileged communications; to seek copies of relevant records; and to make settlement payments on behalf of its insureds. [DE 25 ¶ 40–41]. These allegations are more than sufficient to put Medical Assurance on notice of the claims against it and the ways in which the Fund asserts it breached its duty of good faith.

Medical Assurance argues that in order to plead bad faith, the Fund "must establish, with clear and convincing evidence, that the insurer had knowledge that there was no legitimate basis for denying liability," and that the complaint should be dismissed because it is "bereft of any allegations to establish knowledge on the part of Medical Assurance of a complete lack of a

14

rational basis for Medical Assurance's actions and a bad faith motive." [DE 27 pp. 9–10]. This argument fails for several reasons. First, and most obviously, the Fund does not need to "prove" anything at this stage, by clear and convincing evidence or otherwise. Rather, the complaint must simply contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In addition, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally," Fed. R. Civ. P. 9(b), so the Fund need not allege specific facts to establish Medical Assurance's knowledge or its bad faith motive at this point. If Medical Assurance can ultimately establish a good-faith basis for each of its actions, it will defeat the Fund's claim, but those arguments are suited for summary judgment or trial, not a motion to dismiss. *Skinner v. Metro. Life Ins. Co.*, 829 F. Supp. 2d 669, 678 (N.D. Ind. 2010) (holding that "bad faith does not need to be pled with particularity" and that the insurer's "arguments for dismissing this claim would be better taken at a later stage in the litigation").

On a more substantive level, this argument interprets the Fund's claim too narrowly, as relating only to Medical Assurance's denial of a claim or of coverage. While some of the Fund's allegations relate to Medical Assurance's handling of its claims, the focus of its bad faith claim relates to Medical Assurance's conduct as to the defense of the claims, including its conflict of interest, of which it did not notify its insureds, its improper sharing of information between claims/defense and coverage personnel, its failure to investigate and attempt to settle the claims, its disclosure of confidential and privileged communications, and its failure to seek copies of relevant records or access to former employees from the receiver. [DE 25 ¶ 41]. If true, these allegations could support a claim for bad faith even if Medical Assurance ultimately demonstrates that it did not owe coverage for these claims. *Phico*, 93 F. Supp. 2d at 990 (holding that an insurer's duty of good faith "encompasses the defense and handling of the claim," and

that a primary insurer's "bad faith or negligent defense of a claim against the insured" is actionable under Indiana law). Given that this action does not depend solely on Medical Assurance's obligation to pay the claims, its argument that the Fund must "plead facts which show Weinberger's compliance with conditions precedent to coverage" and "timely notice" of the claims is misplaced. [DE 29 p. 11]. Therefore, the Court finds that the Amended Complaint adequately states a claim for Medical Assurance's breach of its duty of good faith under Indiana law, and declines to dismiss the count on that basis.

**B.    Statutory Subrogation**

Count II asserts a statutory subrogation claim under Indiana Code § 34-18-15-4. In this count, the Fund asserts that Medical Assurance failed to pay certain judgments and settlements it was obligated to pay. Pursuant to the Act, the Fund has paid the claimants those amounts, and the Fund is subrogated to the claimants' actions against Medical Assurance to collect those payments. Ind. Code § 34-18-15-4. Medical Assurance first argues that this count should be dismissed essentially because the Fund has failed to plead the absence of facts that would justify Medical Assurance in denying coverage.

However, regardless of any basis Medical Assurance may have had to deny coverage, the Fund has pled sufficient facts to overcome those defenses on the grounds of waiver or estoppel. Under Indiana law, even where an insurer may have a meritorious defense to coverage, it can be estopped from raising that defense when it "assumes the defense of an action on behalf of its insured without a reservation of rights but with knowledge of facts which would have permitted it to deny coverage." *Founders Ins. Co. v. Olivares*, 894 N.E.2d 586, 592 (Ind. Ct. App. 2008); *Transcontinental Ins. Co. v. J.L. Manta, Inc.*, 714 N.E.2d 1277, 1281–82 (Ind. Ct. App. 1999); *see also Ashby v. Bar Plan Mut. Ins. Co.*, 949 N.E.2d 307, 312–13 (Ind. 2011) (holding that summary judgment could not be granted even though the insured failed to comply with the

policy's notice provision, based on disputed facts as to whether the insured was estopped from raising that defense). Here, the Fund pled that Medical Assurance undertook the defense of the malpractice actions, that it failed to reserve its rights within a reasonable time and failed to advise the insureds of coverage issues, and that it knew about these coverage issues but continued representing the insureds while under a conflict of interest. [DE 25 ¶¶ 23, 29, 31, 40]. These facts meet the elements of an estoppel claim, and suffice to permit the Fund to proceed past the pleading stage. *See Manta*, 714 N.E.2d at 1282.

Medical Assurance's final argument, that the malpractice claimants have no right of action against it in the first place, so the subrogation of their claims to the Fund is meaningless, is frivolous. In Indiana, "an injured third party may not bring a direct action against a wrongdoer's liability insurer *until he first obtains a judgment against the insured*." *Wolverine Mut. Ins. V. Vance ex rel. Tinsley*, 325 F.3d 939, 944 (7th Cir. 2003) (emphasis added); *see also Donald v. Liberty Mut. Ins. Co.*, 18 F.3d 474, 480 (7th Cir. 1994) (holding that an injured person "cannot sue the tortfeasor's insurance company directly—at least before obtaining a judgment against the insured"); *Cromer v. Sefton*, 471 N.E.2d 700, 703 (Ind. App. Ct. 1984) ("Nevertheless, a successful personal injury plaintiff can bring an action against the liability carrier if it refuses to honor its contract."); *cf. Cain v. Griffin*, 849 N.E.2d 507, 515 (Ind. 2006) (holding that an injured party could sue an insurer directly even without securing a judgment against the insured where the policy applied regardless of fault and the injured party constituted a third-party beneficiary). Here, all of the amounts for which the Fund seeks recovery were owed to the claimants based on judgments or court-approved settlements. Thus, those claimants have actions against Medical Assurance for its non-payment, and the Fund is subrogated to those claims pursuant to § 34-18-

15-4 due to its payments to the claimants on Medical Assurance's behalf. Medical Assurance's motion to dismiss is therefore denied as to Count II.

## IV.  CONCLUSION

Medical Assurance's motion to dismiss [DE 26] is taken under advisement as to Count I, and DENIED as to Count II. The Court respectfully CERTIFIES the following question to the Indiana Supreme Court:

> Does Indiana law allow the Patient's Compensation Fund to pursue a claim against an insurer for the insurer's breach of its duty of good faith to its insured, through the doctrine of equitable subrogation?

Consistent with Indiana Rule of Appellate Procedure 64(B), the Clerk of the Court is DIRECTED to forward the following to the Clerk of the Indiana Supreme Court: (1) a copy of this order; (2) a copy of the case docket, including the names of the parties and their counsel; and (3) the First Amended Complaint [DE 25], the motion to dismiss and related briefing [DE 26–29], and this Court's April 3, 2014 order [DE 35].

SO ORDERED.

ENTERED:  June 5, 2014

/s/ JON E. DEGUILIO
Judge
United States District Court